## WILL McWHIRTER v. THE STATE.

### No. 1571.    Decided April 3, 1912.

### Rehearing Denied April 24, 1912.

**1.—Assault to Rape—Motion for New Trial—Statement of Facts.**

The filing of a statement of facts and bills of exception after term time relates only to matters occurring on the trial of the case, and has no reference to issues formed on grounds stated in the motion for new trial, and where the motion for new trial was not sworn to and no affidavit attached with reference to the complaint therein that unsworn and prejudicial information had gone to the jury, and the evidence on said motion with reference to such complaint was filed after the adjournment of court for the term, the same could not be considered on appeal. Following Probest v. State, 60 Texas Crim. Rep., 608, and other cases.

**2.—Same—Charge of Court—Words and Phrases.**

Where it appeared from the charge of the court that the word "not" had no proper place in the paragraph of the charge in which it was used, but said paragraph as a whole conveyed the meaning to the jury intended by 'the court, and that the use of this word was but-a clerical error, and the objection to said charge was of a general nature, there was no reversible error.

**3.—Same—Argument of Counsel—Requested Charge.**

Where the objection to the argument of State's counsel was not verified by a bill of exceptions and no charge was requested to withdraw the same, there was no error.

**4.—Same—Res Gestae Statements—Sufficiency of the Evidence.**

Where, upon trial of assault to rape, the evidence showed that the alleged female was only twelve years of age and the daughter of the defendant; that she came running from the scene of the alleged offense crying and saying that her father was drunk and had had her down beating and hurting her and that she wished to hide from him, and that her testimony was corroborated by other witnesses who, going to the place, found evidence of a struggle and her drawers and hair ribbon; that her hair was disheveled, with dirt and leaves in her hair and on her back, etc., the conviction for assault to rape was sustained, although her testimony on the stand was to the effect that her father made no assault upon her and was contradictory of her res gestae statement. Davidson, Presiding Judge, dissenting.

**5.—Same—Charge of Court—Parent and Child.**

Where, upon trial of assault to rape, the court's charge properly submitted that issue together with that of aggravated assault, reasonable doubt between the degrees, the parent's right to use reasonable force in correction of the child, and also a charge on circumstantial evidence, there was no reversible error in a conviction for assault to rape.

**6.—Same—Case Stated—Sufficiency of the Evidence—Legitimate Deduction.**

Where, upon trial of assault with intent to rape, the jury were authorized by legitimate deductions from the evidence to find that the defendant had assaulted the alleged female with the specific intent to have carnal knowledge of her, the conviction for said offense will not be disturbed. Davidson, Presiding Judge, dissenting.

Appeal from the District Court of Haskell. Tried below before the Hon. John B. Thomas.

Appeal from a conviction of assault with intent to rape; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*Lattimore, Cummings, Doyle & Bouldin* and *Joe Irby* and *Gordon B. McGuire* and *W. H. Murchison,* for appellant.—On the question of the jury receiving unsworn prejudicial information, and filing statement of evidence thereof after adjournment of court: Jarrett v. State, 55 Texas Crim. Rep., 550, 117 S. W. Rep., 833; Clark v. State, 45 S. W. Rep., 696.

On question of court's charge with reference to moderate correction of child by parent and using the word "not" in said charge: Harris v. State, 55 Texas Crim. Rep., 469, 117 S. W. Rep., 839; Stewart v. State, 51 Texas Crim. Rep., 223, 101 S. W. Rep., 800; Graham v. State, 61 S. W. Rep., 714; Johnson v. State, 15 S. W. Rep., 647; Moore v. State, 13 S. W. Rep., 152.

On question of insufficiency of evidence: Dockery v. State, 34 S. W. Rep., 281; Moon v. State, 45 S. W. Rep., 806; Carson v. State, 24 S. W. Rep., 409; Cromeans v. State, 59 Texas Crim. Rep., 611, 129 S. W. Rep., 1129; Sanford v. State, 12 Texas Crim. App., 196; Mayo v. State, 7 id., 342; Sirmons v. State, 44 Texas Crim. Rep., 488; Cotton v. State, 52 Texas Crim. Rep., 55.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, Judge.—Appellant was indicted, tried and convicted of the offense of assault to rape on a girl under fifteen years of age, and his punishment assessed at ten years confinement in the penitentiary.

1. One ground of the motion is that Jim Bennett, during the trial, gave to the jury "unsworn, inflammatory and prejudicial information," in that one juryman asked him, "What caused those scars on the face and neck of Will McWhirter (defendant)?" Bennett replied, in the hearing of all the jury, "He got on a big drunk in Weinert and got into a fight and came near getting his d—n head cut off." The motion for new trial is not sworn to by appellant or anyone else; no affidavit is attached to the motion for new trial by any person that such took place. It appears that the court heard evidence on this allegation in the motion, but the evidence was not filed until July 21, 1911, court having adjourned on June 21. In an unbroken line of decisions it has been held by this court, that the provisions relating to filing of statement of facts and bills of exception after term time relate only to matters occurring on the trial of the case, and have no reference to issues formed on grounds stated in the motion for new trial. See Black v. State, 41 Texas Crim. Rep., 185; Probest v. State, 60 Texas Crim. Rep., 608, and cases there cited. The motion for new trial not having been sworn to, no affidavits as to such facts being attached to the motion, and the evidence being filed after the adjournment of court for the term, we can not consider this ground in the motion for new trial.

2. The appellant complains of the following paragraph of the court's charge, the grounds being also copied:

"The court erred in the seventh paragraph of the general charge which is as follows: 'In this case the evidence shows that the defendant is the father of the alleged injured female and the laws of this State provide that violence does not amount to assault when used in the exercise of the right of moderate restraint or correction given by the law to the parent over the child; and you are charged that before you could *not* convict the defendant of the offense of assault to rape, you must believe from the evidence beyond a reasonable doubt that an assault was made by the defendant upon the person of Leona McWhirter, as alleged, that is, that the defendant used some degree of unlawful violence upon the person of his daughter, Leona McWhirter, and must further believe that at the time said assault

was made (if made) there was a specific intent in the mind of the defendant, Will McWhirter, to have carnal intercourse with the said Leona McWhirter, either with or without the consent of the said Leona McWhirter, and that the said Leona McWhirter was then and there a female under the age of fifteen years and not at the time said assault was made (if it was made) the wife of the defendant.'

"Said paragraph of said charge is erroneous. 1st, because it is not the law of this case; 2d, because said charge is misleading, confusing, contradictory and meaningless and requires the jury that before they *'could not convict the defendant'* they must find from the evidence beyond a reasonable doubt all those facts as true, which, in law, would establish the defendant's *guilt* of an assault with intent to rape."

It will be seen that the grounds of complaint are: 1st, because it is not the law of the case." This is too general to be considered, in that it points out no error. (Quintana v. State, 29 Texas Crim. App., 454; 2d, because it is confusing and misleading, in that the words "could not convict defendant" are used, when the court intended to say, "that before you can convict the defendant of the offense," etc., the word "not" having no proper place in this paragraph of the charge. However, it was not such error as should result in a reversal of the case, for the jury could not have been misled, and the paragraph as a whole conveys the meaning to the jury intended by the court. It is but a clerical error; the meaning of the paragraph is not changed, and no one could draw a wrong conclusion therefrom.

3. The complaints in the motion about the remarks of the county attorney are not verified by any bill of exceptions, and, of course, we can not review the matter. No charge was asked instructing the jury not to consider such remarks, if made, and in consequence no error is presented.

4. This disposes of all grounds of the motion except the one alleging the insufficiency of the evidence and one other ground which will be discussed in connection with this one. We have read and reread the evidence, and not agreeing with appellant in his contention, we have concluded to make a rather full statement of the case. It appears that on the afternoon when appellant is alleged to have committed the offense, he went to the schoolhouse where the girl was attending school and called for her. When told that she was not through reciting, he drove off. When school was dismissed, appellant's daughter got in a buggy with some friends and started home. In going through town she was seen by appellant and told to come and get in the buggy with him. When she did so, he drove to the Robertson place (where he lived the previous year), the testimony for defendant tending to show that he was going after a clothes line and monkeywrench he claimed to have left there. The clothes line was near the house, but no one seems to know where the wrench was located. Appellant did not drive to the house, but drove into a thirty-acre pasture, and, as witnesses say, to a point where the timber is thickest in the pas-

ture. The girl was only twelve years of age. Raymond Levy testified he was in the yard cutting wood, late in the evening, when he saw ·Leona (the girl) coming to the house "hollering," saying: "Leona was west of me at that time, out in the pasture, coming running toward the house. Mr. McWhirter also came running. Leona ran until she got to the house. Mr. McWhirter did not come all of the way to the house at that time, but he went back and got his buggy first. No, sir; Mr. McWhirter did not say anything to me as he came up toward the house the first time, before he went for the buggy, as at that time he was about a hundred yards from the house, when he quit running. However, at that time Mr. McWhirter was calling to the girl, calling 'Leona! Leona!' that way. When Leona came to where I was she was crying. When Leona came up where I was cutting wood, she spoke and says: 'Don't you tell my papa I am here; he is drunk, and had me down beating me and hurt me.' Then she went on through the fence, and turned around again, and says, 'Don't you all tell.' I looked at Leona's clothes and her hair, and saw a lot of dirt and trash in her hair and· on her back. I noticed that she only had one hair ribbon on also. I do not know where the other one was. Leona then went on to the house and hid in the closet."

Mrs. Bertha Levy testified: "On the fourth day of January of this year, nineteen eleven, I saw Mr. McWhirter at my house, in my kitchen. When I first saw Mr. McWhirter he was out in the pasture coming toward the house. At that time he was coming toward the house in a buggy, driving as fast as his horse could carry him through the mesquites. Just before this time that Mr. McWhirter came to my house, his daughter had come to my house. His daughter's name is Leona. The first time that I saw Leona McWhirter that day was when she came into my house; she came into my house running and brushing her clothes. As to how she was brushing her clothes, will say that she was brushing her coat, brushing the dirt and leaves off of her shoulders. She was also looking back toward the pasture from where she came. When Leona McWhirter came to my door, she says, 'Good-evening,' and commenced crying and says, 'I want you to please let me hide in here; my papa is drinking and he got me down and has been beating me all evening, and hurting me, and I want to hide, and please tell him if he comes that I have done gone on my way home though the pasture, and tell all your little children if he comes that I have done gone home, and I will hide in here.' I said, 'All right; hide upstairs or hide in my front room, or somewhere,' and she ran in and hid in the little stair-room, where we keep clothes hanging in there, and covered herself up with my big coat. That day Leona had on a plush-looking coat and a blue dress. I could not tell how she had her hair fixed, as she had her hair all down, it was all torn down, and I could not tell how it had been fixed. She had dirt and leaves in her hair and trash of that sort. The leaves that I speak of were little, old, dead-looking leaves, dead-

looking leaves and grass. She also had some dirt on one side of her face and on her shoulders and back. I noticed the dirt on her shoulders and back as she went into the front room. I did not notice whether Leona at that time had a hair ribbon on or not, her hair was all down, you know, but I think it was plaited and had been tied up on two sides, you know. No, Leona did not have either a bonnet or a hat, but just a little scarf of a thing. The little girl, Leona, went into the stair-room and hid—into the front room. The little girl told me that if her papa came there to tell him she had gone another way home through the pasture. I then stepped to the door; I heard the buggy coming, and Mr. McWhirter was coming so fast that I hollered at my little boy, who was out cutting wood, to get out of the way, as I was afraid that he would run over him. Mr. McWhirter drove up and asked my little boy where his little girl was, and he asked my little boy, 'Did she go in the house?' and he told him no, sir; she had done gone home the near way through the pasture. Mr. McWhirter then drove on out toward the barn and looked kind of around the barn. When Mr. McWhirter started toward the barn, I went into the front room. When I got into the front room Leona said: 'Has he gone?' and I said, 'Yes, I think he has; he started toward the barn.' Then Leona says, 'Oh, I am so thankful to you!' and then I told her, 'Be still, I hear the buggy.' I started back to the kitchen and Mr. McWhirter was in the kitchen, and he said, 'Is my little girl'—he first said, 'Is she upstairs?' and I says, 'She is not upstairs.' He says, 'She is in here somewhere,' and he went on into the front room and went to the little stair-room, and he pulled the cloak off of her and commenced laughing and pretended to be tickled, and says, 'Ha, ha, daughter, come on, Leona, come out of here.' Then he said, 'She got frightened awhile ago; I was going to shoot some birds, and she got excited and the horse became unmanageable and she ran off.' He pulled her out of the stair-room, kind of took her by the hand and pulled her out. The little girl looked just like she would faint; I never did see the like. I reckon she was frightened; she looked like a corpse. He never waited at all; he said, 'Come on, daughter, let's go on home,' and he went out toward the buggy. She sort of stopped and he says, 'Come on, let's go.' Then she said to me, 'Please let your little boy go with me; I am afraid to go by myself; I don't want to go because I am afraid to.' I says, 'Why don't you want to go with him?' and she said, 'He will kill me,' and I said, 'Certainly not your own papa?' and she said, 'He will; he done said he would.' I then called to my little boy and said, 'Raymond, come here,' and I told him I wanted him to go with her, and he said, 'Mamma, I can't; I got to cut the night wood,' and I says, 'That don't make any difference,' and I said to Mr. McWhirter, 'Raymond is going home with you to see why his papa has not come.' Charley had gone to Weinert. Charley is my

husband. · Leona said, 'Come on, Raymond.' Mr. McWhirter called her about that time and told her to come on, and she said, 'All right, wait until I get my scarf,' and at that time she had her scarf in her hand, but she just made out like she was going to get it. Then as soon as she saw Raymond start to the buggy, she went on out there and he helped her in and Raymond got in the buggy and they went on off. That occurred between 5 and 6 o'clock in the evening—I was just starting to prepare supper. As to what Mr. McWhirter's condition was when he was there, will say that he got around awful lively, but as to whether he was drunk or not, I never noticed—I never noticed him much."

It was shown no gun was fired in the pasture that evening. Chas. Levy testified when he got home about 6 o'clock in the evening, his folks told him what had happened, and the next morning he and Mr. Chis. Marr went down in the pasture to investigate. That they tracked the buggy tracks, and near the center of the pasture they found a pair of drawers and a bow of ribbon on the ground. The ground was all torn up, and he saw the footprints of a man and woman and signs of a scuffle; that there were two torn up places, about five or six yards apart. The drawers and ribbon were shown to be the property of defendant's daughter, Leona. He also testified to finding a half dollar, near this place, which was the property of the girl.

Herman Weinert testified that he and several others went to the pasture the next morning, about three hundred yards west of Levy's house. "We went to a place there where about the thickest part of the brush in the pasture was, that was where the persons had been. The first thing that we saw there was a pair of drawers, I suppose, woman's drawers, and a bow of hair ribbon. The hair ribbon was a dark color—I do not know whether it was black or not, but it was a dark color. (Here the district attorney presented the witness with a bow of black ribbon.) I think that this bow of ribbon that you present to me now is the one that we found there that day; if it is not the same one it is one just like the one we found. We found this bow of ribbon right at the place where there was an impression that looked to be the impression of somebody's head in the ground. As to the impression I speak of, it was as if some person was lying there east and west, with the head to the east, then right here (indicating a little further to the west) an impression as of one's setter, or butt, the butt of a person, and then here (indicating a little further to the west) the heels of a little or a very small shoe. The heel prints looked like they were those of a small woman's or a girl's shoe heels. The other impression was very much like a person had been down over the other one, looked like the knees of another person had been down there (indicating between the shoe heel prints) and had been working there. Yes, sir, there were a man's track there, larger tracks, looked like about an eight or nine. Yes, sir,

there were toe prints of a man there, prints from here (indicating lower part of limbs) on up like about in this shape (kneeling). The ground was torn up around there just about as much as a person would use to do it on. There was another set of prints there on the ground off in a northeast direction from the one I have told about, about twenty or thirty yards, I suppose; I didn't step it, but something like that. There were some bushes there that we went around, walked around. There was not as many impressions at the last place, but it looked like there had been a scuffle going on there, but we could not tell whether there had been anybody lying down there or not. The impressions were there at the second place, but they were not as plain there; it looked like there had been a scuffle there all right, but that they had not got down or fell down there. The drawers that we found there were right by the impressions; the impressions were this way (indicating east and west) and the drawers that we found were just to the south of the impression, and they were pulled inside out. Yes, the drawers were inside out. I suppose those were what you would call small drawers—I have seen larger ones. They were a female garment, anyway." He adds, "This place where we found these impressions in the ground was the heaviest wooded place in the pasture—more timber there than any other place in the pasture."

B. Stewart testified he was boarding at appellant's house, and was there when appellant came home about 10 o'clock that night. That appellant's wife told him, "There were some men up here to see you awhile ago," and it seemed to flustrate him, and he asked who it was. His wife told him it was Mr. Ethridge and others, when he replied, "Yes, I am going to kill some G—d d—n s—n of b—h knocking on me," using other vile language. "Leona McWhirter was there at home when her papa came home. Mr. McWhirter came in and sat down. He said to his wife, says: 'Emma, I want you to see Mrs. Newsome in the morning, and see if we can not board Leona with Mrs. Newsome; I am not going to take her out on the farm this year, and work her like she has been worked; she is too good a girl to be worked on the farm, or do any hard work, and I am not going to take her out on the farm this year.' He then told his wife, 'She is just too good a girl and I ain't going to do it.' And then he spoke to his wife and said, 'Emma, don't you think she is the best girl in town?' and Mrs. McWhirter was a little slow in answering, and then she told him she didn't know, that there were other good girls there. He then turned around to me and says, 'Stewart, don't you think she is the best girl in town?' and I told him, 'Well, I am not acquainted with any other little girls yet, but I think Leona is one of the nicest little girls that I ever got acquainted with.' Mr. McWhirter turned to Leona then and commenced telling her what he was going to get her; that he was going to get her some nice shoes and some nice clothes, and that he was

going to let her stay there and go to school. McWhirter got up then and walked into the dining-room and called to Leona. She didn't want to go. I told her to go ahead, that he would not hurt her. She went on into the room then and was in there a few minutes, and her mother got up and went on into the room, too. When her mother went into the room, Leona came out back into the room where I was. . . . Well, when Leona came back into the room, she came right around behind me and got between me and the wall, on the north side of me. McWhirter cursed around in the other room a while and said that he was going back to town and kill some God damn son of a bitch, and Mrs. McWhirter was staying in there trying to get him not to. McWhirter said that he was going to town and kill the damned sons of bitches and she told him not to go out, and he opened the hall door and went out on the gallery and I told him, I said, 'Will, there is nobody in town, and you had better listen to your wife and come back in and go to bed.' He stopped out there a little while and directly he came back into the house, and come around and sit down and sat there a little while and never said a word. Directly he said to his wife, 'Emma, is there plenty of water?' and she said, 'Yes, there is plenty of water.' McWhirter then said, 'Me and Leona had better take a bucket apiece and go and get a couple buckets of water,' and his wife said, 'There is a plenty of water—enough to do until after breakfast.' 'Well,' he said, 'it won't hurt nothing for me and Leona to take a couple of buckets and go and get a couple buckets of water,' and Mrs. McWhirter told him, 'You can take the buckets and go and get some water if you want to, but Leona ain't going.' Then he went out of his head again. He went to cursing and got up and went back into the dining room, and called the girl again. Leona, when he called her, just wrung her hands and said she was afraid to go, and I told her to go on, and she went and her mother followed her. But the girl had not more than got out of the room I don't suppose hardly, until she turned and came back again. Mrs. McWhirter stayed in there a little while and then she come back and McWhirter came back too. I heard McWhirter talking and cursing while he was in the dining room. He called Leona and she said she was afraid to go. Leona did not go and then he came to the door, and says, 'Leona, come here.' Mrs. McWhirter told him, 'If you want to talk to Leona, you come right in here and talk to her in the room, right in here.' McWhirter then cursed around a little bit and talked about going back to town and then eventually come and sat down."

These are the circumstances in the main relied on by the State to sustain the conviction. The girl Leona McWhirter testified that he did not mistreat her in any way that afternoon. That she got frightened at the horse, and told her father she wanted to "go out" and got out of the buggy and squatted down, unbuttoning her drawers. That her father told her to get back in the buggy, or he would switch her, but she was frightened at the horse, stepped out of her panties, and

ran to the house of Mr. Levy. That she also lost her hair ribbon out there. That all her father did was to threaten to whip her if she did not come and get in the buggy. She denied telling Raymond Levy that her father had done anything to her, and denied telling Mrs. Levy what Mrs. Levy testified, but says she only told her that her papa was going to whip her because she would not get back in the buggy. She testified when her father got out of the buggy he did not hitch the horse. She said she got the leaves in her hair and on her back by running under some trees in going to the Levy house. That she does not know when she lost the ribbon or the half dollar; that she had not been at home since this occurrence, and gave as a reason that there was not any school where they lived. As hereinbefore stated, the court submitted the issues of assault with intent to rape, and aggravated assault in properly worded charges, instructing the jury as to reasonable doubt between the degrees, and instructed that even though they believed beyond a reasonable doubt that appellant did chastise the girl, as she had informed Raymond Levy and his mother, yet if they found his intent was only to secure obedience to his commands, and such force was only used that a parent has the right to use in the correction of his child in order to secure obedience to his authority, they would acquit him. The charges referred to are not subject to the criticism contained in appellant's motion. The court further charged the jury:

"In this case you are charged that the State relies for a conviction upon circumstantial evidence alone, and in order to warrant a conviction upon circumstantial evidence, each fact necessary to establish the guilt of the accused and to the conclusion sought, must be proved by competent evidence beyond a reasonable doubt. All the facts (that is all the facts necessary to establish the guilt of the defendant) must be consistent with each other and with the main fact sought to be proved; and the circumstances taken together must be of a conclusive nature, leading on the whole to a satisfactory conclusion, and producing in effect a reasonable and moral certainty that the accused committed the offense charged; but in such case it is not sufficient that the circumstances coincide with account for and therefore render probable the guilt of defendant, they must exclude to a moral certainty every other hypothesis than that of the defendant's guilt."

The question presented is, was the jury by any legitimate deductions from the foregoing evidence authorized to find that defendant had assaulted his daughter, and if so, was it with the specific intent to have carnal knowledge of her? The jury found such to be the fact under a proper charge; the trial court, on motion for new trial, finds such to be a fact, and if the evidence authorizes such a deduction, shall we, removed as we are from the scene, not permitted to see or hear the witnesses, adjudge that their deductions were unauthorized? Our laws have provided that a defendant can waive any right in a felony case, except a trial by jury, and this must be accorded to him,

and when he has had a trial by a jury, there being no complaint that they were influenced by bias or prejudice, or ill will, shall we disturb their verdict, when it has been approved by the trial judge? If the jury could not legitimately deduce from the facts and circumstances in evidence the elements of the crime charged, we should and will protect the liberty of the citizen, but if the evidence authorizes such deductions, legitimately, we would be usurping power to disturb the verdict rendered by them. The evidence in this case shows a young girl come running from a thickly wooded place in the pasture; she is crying and says her father had whipped and mistreated her; she hides from him; people going to the place find evidence of a struggle, and her drawers and her ribbon; her hair is dishevelled, with dirt and leaves in her hair and on her back. Witnesses say that there were no leaves on the trees at this time but only on the ground, Mr. Robertson, the owner of the pasture saying: "That was a thirty acre pasture. The pasture had timber in it. No, there were no leaves on the trees at that time. I was shown the place where the offense is said to have occurred. On the ground there were right smart dry leaves." Mr. Weinert testifies there were no leaves on the trees; that a horse had been hitched to a tree near the scene of the alleged offense. Thus it is seen that the girl is contradicted in every statement she makes on the trial of the case, and her res gestate statements made at the time would be authorized to be accepted by the jury, and the other circumstances in the case would authorize them to arrive at the conclusions at which they did arrive. We can not say at this distance, that the jury was wholly unauthorized to deduce from the evidence the conclusion which they wrote into their verdict, and the judgment is affirmed.

*Affirmed.*

DAVIDSON, PRESIDING JUDGE (dissenting).—The evidence utterly fails to show an assault to rape. The judgment should be reversed for want of testimony to sustain the verdict.

[Rehearing denied April 24, 1912.—Reporter.]